### THE STATE OF KANSAS v. BENJAMIN F. STRINGFELLOW.

#### *Error from Atchison County.*

To maintain ejectment, the plaintiff must show a paramount title or fail in the action.

Sections sixteen and thirty-six, in each township, granted to the State by Act of Congress, admitting the State, of January 29th, 1861, for the purposes of schools, were, by the provisions of Section three of that Act, vested in the State, unless before the passage of the Act they had been ''sold or otherwise disposed of'' by the United States.

The selection and occupancy of such lands, before the survey thereof, gave the occupants no right whatever unless that were followed by a purchase from the United States prior to the public sale of the body of lands, in which they were included.

*Semble*, that the claim of such lands in September 1854, before the public survey and the occupancy thereof, and the laying out thereof, into lots as a town site, without an attempt to purchase from the United States, would not have prevented the title from vesting in the State under the Act of admission.

The object of the Act of May 30th, 1854, was to define the boundaries of, and establish municipal governments within the Territory of Nebraska and

Kansas, with all the necessary governmental machinery in the inauguration and management of which, the people were omnipotent under the restrictions of the Constitution and laws of the United States, with legislative powers extended to all rightful subjects of legislation, including the power to establish schools.

No particular words are necessary to constitute a grant of lands, especially for public uses.

Section 34 of the Organic Act, providing that when the lands in the Territory shall be surveyed, "Sections No. sixteen and thirty-six in each township, shall be and the same are hereby reserved for the purpose of being applied to the use of schools in said Territory, and in the States and Territories to be hereafter erected out of the same," *construed* to contain something more than a mere reservation from sale, and *held* that it amounts to a grant of the lands therein described to the people of the Territory, for the use of schools.

The object of the grant was to furnish a basis for a perpetual fund for the benefit of the people, and they were authorized to make the lands available during the Territorial existence. A sale of the lands or a part, *held* to have been contemplated, and the manner of making them available, was properly entrusted to the Legislature to determine, and a conveyance by its authority (Act of 1855,) of the land in controversy, to the grantors of the defendant, *held* to vest the title in them, and *held* that as their assignee the defendant was entitled to the possession of the land.

An action in the nature of ejectment brought by the State of Kansas against the defendant in District Court of Atchison County, to recover the possession of a part of the southeast quarter of section 36, township 5, range 20, and known as lot 1 in block 63, in the City of Atchison.

The case was submitted to the judge of the District Court, on the following agreed statement of facts:

"It is agreed between the parties that the land in dispute is a portion of section No. 36, in township No. 5, in range No. 20, in said Atchison County. That before the survey of the public land in said county, to-wit: in September, A. D. 1854, said section was claimed, occupied and laid out into lots as a town site, and was in June 1857, patented by Hon. R, J. Walker, then Governor of Kansas Territory, to the Atchison Town Company, a duly existing corporation under the laws of said Territory, and that said defendant now has all the title to said land which was conveyed to

said Town Company by said Governor in said patent, and no other title or right thereto except such as derived as assignee of and from said Town Company. It is further agreed that said Town Company had not at said time, nor has since received any title to said land except such as derived by virtue of said patent; and that the State of Kansas, by joint resolution of its Legislature approved January 20, 1862, accepted the propositions of the Act of Congress for the admission of the State of Kansas into the Union, approved Jan. 29th, 1861, and that the Interior Department of the United States, in its report of sections sixteen and thirtysix, sold or otherwise disposed of, did not report said section to the State of Kansas before sold or otherwise disposed of, and that said State has selected no land in lieu of said section. It is further agreed that defendant now claims exclusive title, and holds possession of said land adversely to plaintiff, and that plaintiff has never parted with any title to said land, or possession thereof, voluntarily (if plaintiff ever had any), unless the State be held to have so parted with its title as the successor of said Territory.

It is further agreed that taxes were assessed on and collected of said land, after it was patented as aforesaid, by the treasurer of said county, for the use of said county and Territory, and also for the use of the State since its admission.

"It is also agreed that the public sales of the body of land, in which the land in dispute is included, were made in September 1859."

The Court found for the defendant, and the case is brought here by the State on error.

*W. W. Guthrie, Att'y Gen'l,* for plaintiff in error, submitted:

1st. The defendant claims that the language " when," etc., "sections numbered sixteen and thirty-six, in each township in said Territory, shall be, and the same are hereby *reserved for the purpose of being applied* to schools in said Territory, and in the States and Territories hereafter to be erected out of the same," 10, U. S. Stat., 28, *are words*

84

*constituting an absolute donation*, of the lands described, to the Territory for its schools.

This claim must be sustained by this Court, or the decision below must be reversed.

Said section thirty-four is a portion of an act of Congress, passed May 30, 1854, " to organize the Territories of Nebraska and Kansas." The purpose of *this act* was solely to erect a civil government over a people occupying a portion of the public Territory, before neglected, *not to dispose of the public lands.* On July 22nd, 1854, Congress passed " An act *to dispose of the public lands in the Territory of Kansas,* to which the Indian title shall have been extinguished." 10, *U. S. Stat.*, 310.

The act of May 30th, was intended to be amended or repealed, at the will of Congress, like a State act organizing a county—in every sense *a public act;* nowhere conferring rights not to be held at the will of the enacting power. At any time might the official term of the delegate to Congress, or that of the members of the Legislative Assembly, although fixed for a definite time, expire ; *or the squatter sovereignty clause of section thirty-two be annulled.*

This position is sustained in the case of *Dartmouth College* v. *Woodward,* (4 Wheat., p. 629,) Justice Story says : " Public corporations are such only as are founded by the government for public purposes, where the whole interests belong to the government." The Territory of Kansas was a public corporation of the United States, founded by Congress in the " Organic Act " for public purposes, where the whole interests, belonged to the government of the United States, and embraced a subject in which Congress might act according to its own judgment, unrestrained by any limitation of its power. " Organic Acts," unlike " Acts of admission," or " Acts for the disposition of public lands," are but "grants of political power," and can confer *no irrevocable franchises,* and are at times subject to be repealed. *See also* " *Vincennes University* v. *Indiana,*" (14 *Howard, p.* 278.)

An organic act is a law of Congress over proper subject of legislation, and its construction is to be governed by the usual rules of construing statutes.

The act of July 22nd was intended to confer rights which might, by the action of its beneficiaries, become *vested in them*, and beyond the control of Congress. " All the lands," etc., " shall be subject," etc. (*See Secs.* 12-13.)

Let the Court mark the difference of purpose of the two acts, and the want of force of the decisions to be referred to by the defendant, as authority in this case, will be readily seen.

2nd. In considering the proper construction to be given to said section 34, let me call the attention of the Court to the legislation of Congress, *organizing Territories* and *setting apart school lands*.

ʻIn organizing the Northwest Territory, no provision was made for school land ; but in act of May 18th, 1796, (Sec. 3,) [ 1 U. S. Stat., 464,] *providing for the sale of public lands* in said Territory, " four sections at the center of each township are reserved from sale." Out of this reserved land Congress, in act of April 30th, 1802, admitting the State of Ohio, grants, upon certain conditions—among others, " that the State will relinquish the right to tax land sold by Congress for five years after sale"—certain lands in *each township* for the use of schools *therein*. 2, *U. S. Stat.*, 175.

May 7th, 1800, the Territory of Indiana was organized ; 2, U. S. Stat., 58 ; March 26th, 1804, an act was passed *for the disposal of the public lands of said Territory*, of which section 5 provides that section number sixteen shall be reserved in each township *for the support of schools with in the same*. (*Id., p.* 277.) On April 19th, 1816, these lands were granted to the *State* of Indiana, together with other lands, for educational purposes, upon a like compact contained in the act admitting the State of Ohio. (3, *Id.* 289.)

So with Michigan, Illinois, and other Territories, upon their admission as States.

In 1848 there was organized the Territory of Oregon, (9 U. S. Stat., 330) ; in 1849 the Territory of Minnesota, (id. 403) ; in 1850 the Territory of New Mexico, (id. 446) ; in 1850 the Territory of Utah, (id. 452); and in each of which there is a section couched in precisely the same language, as is section 34 of Act of 1854, and the acts are substantially alike.   In 1850 (id. 452), California was admitted as a State, without having had a Territorial organization, with the consideration of " the propositions tendered by the people of California as articles of compact " postponed.   The three last " acts " referred to, became laws upon the same day.

In 1850, (September 27,) an act was passed " to provide for the survey, and to make donations to settlers, of the said public lands," (9 U. S. Stat., 496,) which does not provide for any *sale* of land, but for donations alone, and which reserves sections sixteen and thirty-six from this purpose, and "*grants* to the Territory the quantity of two sections of land in said Territory, to aid in the establishment of a university in the Territory of Oregon."

In 1851, (Feb. 19,) Congress passed an Act, authorizing the Legislatures of Oregon and Minnesota, to make laws to protect from waste sections sixteen and thirty-six, "reserved in each township for the support of schools therein," (id. 568,) and grants two sections of land to Minnesota for university purposes, as was done to Oregon in 1850.   Here let me remark, that an act similar to said " section 1," passed to operate in the Territory of Mississippi, was adjudicated in Gaines *v.* Nicholson, 9 Howard, 356, affirming the power of Congress over lands *reserved* in that Territory for schools by Act of 1803.   The Act of 1803 contained a section like "section 34," excepting the words, "being applied to." Apply the principles of law applied by the Court below, and the judicial construction of the act of 1803, necessarily given in said case, is to govern the act of 1854.

In 1854, (July 22,) in the same Act which provides for the sale of the public lands of Kansas and Nebraska, there

is provision made for the donation of the lands of New Mexico to actual settlers up to A. D. 1858, and a section (5), in the exact words of section 15 of the Oregon Act of 1850, and a section (6), "reserving two townships for the establishment of a university *in said Territory*, and *the State* hereafter to be created out of the same."

In 1855, (February 21, 10 U. S. Stat., 611), Congress passed an act providing a Surveyor-General for Utah, but not for any sale of land, and which contains two sections (2 and 3) in the exact words of sections 5 and 6 of the Act of July 22, 1854. The Government, to this day, has never received a dime from the proceeds of public lands in Utah; yet, ever since February 21, 1851, that Territory has, perhaps, *absolutely owned, by virtue of that reservation*, two townships of land for university purposes.

Has it ever been claimed that any other Territory than Kansas had had dedicated to her by Congress, in her organic act, lands for purposes of her common schools? Kansas alone has the honor of that discovery, if the fact exists. Why did Congress pass the act of February 19, 1851, authorizing Oregon and Minnesota to protect sections sixteen and thirty-six, if those lands had been before dedicated to those Territories for school purposes? And they had been so dedicated, if those sections were dedicated to Kansas by virtue of section 34 of her organic act.

As has been shown, *in providing for the disposition of the public lands*, Congress has, in several instances, set apart and donated, "for the establishment of a university *in said Territory*," a portion of such lands; but, each of these instances has been where Congress contemplated *only one* "State hereafter to be created out of the same" (Territory); and in no instance have the lands intended for a common school fund been treated by Congress or the Territories, (other than Kansas), as donated, by being reserved for the purpose of being applied to schools.

Congress has sometimes *set out* the Territories, at some time of their existence, with two townships for a university

fund for the whole Territory, but has ever reserved the princely donation intended for the common schools of the several townships, until the townships should exist to need, which has been in no other instance than at the time of the admission of the State, and then only as part of a compact necessary to the protection of the rights of the Government within such State, which of course, could never be secured, if the means to be used by the Government had been before parted with.

The language used in case of Oregon and New Mexico is different from any other case, for reason that Congress thought it advisable to offer extra inducements to secure the settlement of those Territories.

The language used in the case of university lands has been either *granted* or *reserved for the establishment of a university in said Territory*; while, in setting apart public land for schools, the language used has been, "reserved for the purpose of *being applied* (that is, something remains to be done,) to schools in said Territory and the States and Territories hereafter to be created out of the same;" and, as has been shown, Congress and the several Territories have united in holding *the reservation* in such case *to be in Congress*, for the purpose of *being applied* by authority of Congress.

The Act of 1854, is the voice alone of Congress, saying, among other things, that the people, desirous of settling in the new Territory, may understand that when Congress shall authorize the sale of the land in said Territory, sections No. sixteen and thirty-six shall not be purchasable at such sale, because Congress, having full power to do so, has reserved them for another purpose, to be applied to such purpose whenever Congress shall see fit.

Would not further legislation be required before the other "States and Territories" could own any portion of said lands, and if so, was not further legislation required to vest the title thereto in the then Territory? It has been

the practice of Congress to organize into a Territory a large extent of territory, to be afterwards carved up by Congress, as the public exigencies seemed to demand, into several States and Territories.

Such was the case with Kansas. Did Congress intend to donate to the then Territory of Kansas, subject to be disposed of by the first Legislative Assembly, which might perhaps represent but a few counties, all of the sections sixteen and thirty-six, of the *then entire* Territory, for the purpose of being applied to the schools of those few counties, leaving no lands to foster the educational interests of those counties to become settled the next year, or for those " States and Territories hereafter to be created out of the same ?"

Had the question of " school land " no uniform legislative history, this Court, I think, would long hesitate to torture the language used in " Sec. 34 " into " words of absolute donation " to the people of the then Territory of Kansas, of those lands which were intended, in after years, to constitute the school fund of several States, to be disposed of by the few adventurers who might control the first Legislative Assembly of a Territory scarcely opened to civilization.

That the Congress of 1857 entertained a like opinion, is shown in the Act of March 3d, by which Congress disposes of a portion of the lands described in said section 34, and reserves other land equal in value, in lieu thereof. 11 *U. S. Stat.*, 254.

That the people of the State of Kansas entertain a like view, is shown by their offer contained in the ordinance of their constitution, proposing to form a compact with the United States, by which the State of Kansas will relinquish forever the right to tax the lands of the United States, etc., in consideration that Congress will grant to the State, for the exclusive use of common schools, sections sixteen and thirty-six in each township of the State, etc., which com-

pact was afterwards entered into, and thereby Kansas received two townships of land for a University, which, Congress treating her unlike the other Territories, had before failed to reserve for her.

In this one fact, it is shown that Congress never intended to be more generous toward Kansas than other Territories. For the Territory of Utah, with her detestable polygamy, was reserved a first selection of land for a University fund, while for the Territory of Kansas, it was denied.

The history of *school lands*, derived through Congress, shows that they have never been "absolute donations," but reserved for, and made subject of, compact between the general Government and States.

3d.   As the people of no Territory before ever had had the benefit of school lands from Congress, the people of Kansas had no right to such an expectation, as the Territorial Act of 1855 provided that the proceeds of the lands thereby to be sold, should constitute a fund *in each township*. If defendant's claim is sustained, since the grant in the act of admission constitutes the land a *State fund*, injustice will be done to the people outside of those townships, wherein the land was sold under Act of 1855.

4th.   I come now to consider the cases relied upon by the defendant as authorities in support of his claim.

In the City of Cincinnati *v.* Lessees of White, (6 Peters, 440,) the case made was, whether, when the proprietors of a tract of land had laid it out as a town site, dividing it into *lots, streets and commons, the streets and commons* being left open for common and public use for the convenience and accommodation of the inhabitants of the town, and the *lots* sold for the profit of the proprietors, could the proprietors afterwards deprive the purchasers of such lots, of the public use of a " common " thus left open ?   Here the proprietors in fact agreed with the lot purchasers, that if they would pay for the lots, they, in consideration thereof, should enjoy the public use of those conveniences which

gave to those lots their value, and, deprived of which, the lots might be valueless.

So with the Lutheran Church case, (2 Peters, p. 578,) the land in question had been specifically set apart by the proprietor of a town site, in laying it out "for a Lutheran Church."

How can either of these cases furnish authority in point?

These lands were expressly set apart for present public use, that value might be imparted to the other portions sought to be sold, just as town proprietors are wont to do.

The lands in question were reserved by Congress for purpose of future application, just as Congress had for years been wont to do, (New Orleans v. United States, 10 Peters p. 710,) is in principle with the Church case. The land was set apart for a "quay," which is a public commercial convenience.

Will the defendant claim that had the General Land Office marked upon the plots of the public lands in the Territory of Kansas, in A. D. 1854, upon each section sixteen and thirty-six, the words "school land," that those sections thereby would have been dedicated to the Territory for schools? Yet he says that the Courts having decided that the town proprietors, who had marked upon their town plots, before offering lots for sale the words "for a Lutheran Church" and "for a quay," thereby dedicated those lands to public use after lots were sold, have decided, in principle, this case in his favor. In one case the words claimed as constituting *a dedication*, are found in provisions for *a civil government;* in the other in provisions for *disposing of lands*. Where is the parallelism?

These cases are good law, but not applicable to the case at bar, and herein I think the defendant and Court below fell into error.

The act brought in question in the case of Rutherford v. Greene's Heirs, (2 Wheaton, p. 196,) was enacted for the specific purpose of making donations of public lands to

soldiers, for meritorious services, and provided "that twenty-five thousand acres of land shall be allotted and given to Major General Greene." The question then made was, as to whether rights in favor of other parties than the beneficiaries of the grant, could attach in the land which had been set apart to be allotted to such soldiers, until after the allotments had been made, and an excess of land therefore determined. The Court very properly held, that Greene's rights attached from the day of the grant, and that nothing remained but to determine the exact location of his tract, in order to make his title to such tract perfect from the day of the grant. Wherein does that decision affect the case at bar?

Again, the case of United States v. Brooks, (10 Howard, p. 445,) is relied on. In this case, the facts were: that while Louisiana was Spanish Territory, the Caddoe Indians, then owning the Red River country, gave to Francois Grappe, and to his three sons then born, one league of land each, which was to be laid off, commencing at the lowest corner of our lands on the Red River, and running up the river four leagues, and one league from that line back, so as to make four leagues of land; which grant was duly made in writing by the Caddoe chiefs, and ratified by the Spanish authorities. Afterwards this written grant was accidentally destroyed. After this, Spain ceded this Territory to the United States, and in July 1835, the Caddoe nation, having petitioned the United States to buy their lands, except the four leagues before described, which were in the petition stated to have been granted to the Grappes, and the evidence of title destroyed, as before stated, made a treaty for the sale of their lands with the United States, at which, after stating the said grant through the Spanish authorities, and the loss of the deed, it is agreed that the Grappes "shall have their rights to the said four leagues of land reserved for them, and their heirs and assigns forever," and provides that the said land shall be laid off "in

conformity with the boundaries established and expressed
in the original deed of gift, made by the said Caddoe na-
tion of Indians to the said Francois Grappe and his three
sons, Jacques, Dominque, and Balthazer Grappe." Brooks
subsequently became the assignee of all the Grappes. The
question made was upon his right to the land, as against
the United States. The United States had recognized the
right of the Indians to those lands, purchased from them;
their right to dispose of those lands, with the consent of the
United States; their former disposition, with the consent
of the Spanish authorities, of the "four leagues," which
were not included in the sale to the United States; and
became bound by the solemn terms of a treaty to its stipu-
lations. What claim did the United States ever have upon
the "four leagues?" None, except to recognize the title
of the Grappes thereto, by virtue of the said "deed of gift"
made by the Caddoes, and which had perished by fire.
"Shall have *their right* to the said four leagues of land re-
served for them, etc., reads the treaty. What right? *The
right then belonging to them*, and never claimed by the
United States. Why mention their right? Because, with-
out they had no written evidence of it. What does the
term "*reserved*," etc., as used, mean? Simply, *reserved
from the operation of the treaty*, by which all the land but
the "four leagues," before held by the Caddoe Indians was
ceded to the United States, and without the use of which,
the "four leagues" would also have been ceded without
notice of the Grappes *rights thereto*.

Mr. Justice Wayne says: "That the first supplementary
article to the said treaty, and the preamble thereof, contain
a *recognition of title in Francois Grappe and his three sons
to the land described* in said article and preamble." And
again: "That the United States, by treating with the Cad-
doe Indians for the purchase of their lands, recognized in
said Indians a right to said lands similar to the rights to
lands generally recognized in Indian tribes with whom the

United States have made treaties;' that is, the right to use, and the absolute title to such lands *as should be reserved* by the Indians *in severalty*.

What relation does this case sustain to the one at bar? See also, 9 Peters, 711; 9 Howard, 356.

The case of the Vincennes University *v.* Indiana, (14 H. p. 268,) I believe alone remains to be commented upon. Justice McLean, and a majority of the Justices, decided the case against the dissenting opinion of Justices Taney, C. J. Catron, and Daniels. Four years after the Territory of Indiana had been organized, Congress passed an act to provide for the survey and disposal of the public lands in that Territory. Section 5 provides, "that all the lands aforesaid, shall, with the exception of the section "number sixteen," which shall be reserved in each township for the support of schools within the same, with the exception, also, of an entire township in each of the three above described tracts of country or districts, (since made Territories and States,) to be located by the Secretary of the Treasury for the use of a seminary of learning, be offered for sale to the highest bidder." The next "section" provides "for certain highways," and other "sections" for other rights in said lands.

The Secretary, October 10, 1806, located the seminary township in the Vincennes district. November 29, 1806, the plaintiffs were incorporated as a University, "with the right to sell the remaining lands under the act of Congress, for the purpose of putting into immediate use the said university. (14 How., 273.) At this time the Territory had no Legislative Assembly, but its laws were enacted by the Governor and Judges, subject to be annulled by Congress at any time and to any extent. Under said act said corporation organized December 6, 1806; said lands were taken possession of, in part sold, and a fund created from the proceeds thereof.

By Act of April 19, 1816, Indiana was admitted as a State, with a provision (upon a condition like that in the

case of Ohio,) "That one entire township, which shall be designated by the President of the United States, in addition to the one heretofore reserved for that purpose, shall be reserved for the use of a seminary of learning, and vested in the Legislature of the said State, to be appropriated solely to the use of such seminary by the said Legislature."

In the constitution of said State at the time of its admission, was a provision which confirmed to the Vincennes University "the same rights and powers as they had existed under the Territorial government," which necessarily included "the right to sell the University lands under the act of Congress, for the purpose of putting into immediate use the said University;" especially since the University had already, in part, exercised this *right*.

January 2, 1822, the State Legislature appointed commissioners to sell the lands in that township. A sale was made, and the proceeds paid into the State treasury.

In 1846, the plaintiffs instituted suit to recover from the State for the use of their University, *the said proceeds*. Justice McLean, in his opinion, decides that by the Act of April, 1816, "the Gibson township (Vincennes) Seminary, was recognized, and its present government sanctioned," that the language used in the sixth section, vested in the Legislature of the State only *that one township to be designated by the President,* the Gibson township only being referred to, to show that the one then appropriated was in addition to it; and that section 1 of article 12 of the constitution, then adopted, having secured to said corporation *the rights existing under the Territorial government,* the title to said township had become fully perfected thereby. Nowhere in said opinion does the learned Justice hold that the title to said township became vested in the Territory of Indiana; but, on the contrary, says that the township reserved by the same act in the Illinois district, became vested in the State of Illinois, upon its admission, by vir-

tue of the act of admission, which differed from that of Indiana, in that in the Illinois act of admission, the language used is, "together with the one heretofore reserved," etc.; while in the case of Indiana, the language is, "in addition to the one heretofore reserved."

I quote his conclusion, (p. 275): "Here both townships are as clearly vested in the State of Illinois as that one only is vested under the act admitting Indiana into the Union." Clearly, if the title had become vested in the Territory by virtue of the act of 1804, as the Court below makes the learned Justice to say, no title thereto existed to vest by virtue of the act of April 18, 1816. Apply this decision to the case at bar, and sections sixteen and thirty-six have been *clearly vested in the State of Kansas, by virtue of the act of January*, 1861, since the passage of the joint resolution of the Kansas Legislature of January 20, 1862. Then the Territory had no right to dispose of the land in question, and the Territorial act of 1855, is a nullity.

Again, Justice McLean says, (p. 274,) that "for the sale of school lands (meaning the school land reserved in the Indiana Act of 1804,) the consent of Congress has been obtained, as that changes the character of the fund." Why obtain the consent of Congress to sell, if the words contained in the Act of 1804, "are words of absolute donation to the Territory?" But the language employed in the Act of 1854 is, "shall be reserved in each township for the support of schools within the same," showing, perhaps, an absolute reservation for a present purpose; while in the Act of 1864 it is, "shall be, and the same are hereby reserved for the purpose of being applied to schools in said Territory, and in the States and Territories hereafter to be erected out of the same," showing that no application of those lands to schools was to be made until Congress should authorize it, and perhaps then for the schools of several different States.

The issue is thus stated by the dissenting Justices, (p. 279); "And the only question before us is, whether the trustees (of the university) have the legal title to these lands, and can recover them back from the persons to whom they were sold by the State, for the purpose of appropriating them to a different seminary;" and in their opinion, (p. 279,) say: "The act of the Territorial government of 1806, incorporating this board of trustees, does not grant, nor profess to grant the lands to the board; and if it had done so, the act would have been void and inoperative, because the Territorial Legislature had no right to grant lands which belonged to the United States, nor to exercise any power over them, without the authority of Congress." "The Act of Congress of 1816, by which Indiana was admitted into the Union as a State, grants these lands to the State for the purpose for which they were reserved. The State is made the trustee. And I am confirmed in this opinion, because, with all the research I have been able to make, I have not found a single instance in which lands reserved in a Territory for the purpose of education, were not afterwards granted to the State, as the trustee to administer the trust, the school sections in the several townships, as well as others." (And the Justice might have added,—as a part of a solemn compact, by which Congress received some equivalent therefor.) "The error in the opinion appears to me to have arisen from regarding the reservation from sale for the purposes of education, as diverting the legal title of the United States, and putting it in abeyance, until some new body was brought into existence, capable of taking the title as grantee, and administering the trust." "I cannot regard the title to lands reserved from sale by Congress for the purposes of education, as standing in this condition. A reservation is not a grant. It does not pass the title out of the United States, but leaves it where it was before." "If such be the result of a reservation, the subsequent conveyance of Congress is of no value; and who is to protect the reserved lands from

trespasses and depredations, while the title is in abeyance?"

The difference which divided the Court in this case, appears to have been, that Justice McLean thought that the "act of admission" recognized and sanctioned the present government of the university, and assented to the securing by the constitution of the State to the University of those rights exercised by it under the Territorial government; while the dissenting Justices thought that the act of admission granted those lands to the State for the purposes for which they had been reserved—the Court being unanimous in holding that no right to sell had been conferred by the Act of 1804. How, then, can the Act of 1854, which was enacted solely as a grant of political power, by the aid of this decision be construed to have reference to the disposal in part of the public lands, that was afterwards provided for in the Act of July 22, 1854, and the Act of 1861?

The collection of taxes by the county authorities, could in no wise effect the right of the State to the land. States lose no rights by the irregular action of ministerial officers. If the Town Company had any rights in said land by virtue of their occupation of it before the survey, those rights became forfeited by their failure to perfect title before the public sales in September, 1859. Such were the terms of the Act of July 22, opening the lands of Kansas to settlement. But Congress having, by the Act of May 30th, given notice that these lands were not in any event to be sold, the Town Company could obtain not even an equitable claim to the land by such occupation.

For defendant in error the case was argued by *Stringfellow* in person, who submitted :

This is a case which can only be settled in the last resort by the Supreme Court of the United States. The opinions of executive officers, the inferences from the actions of Congress, have but little weight in the decision of

these questions. "Whenever the question in any Court, State or Federal, is, whether title to land, which was once the property of the United States, has passed, that question must be resolved by the *laws* of the United States. It is not to be decided by the opinions of land officers, nor by resolutions of Congress, but by the *law.*

The State claims title under the first proposition of Section three of an Act of Congress, entitled, "An Act for the admission of Kansas into the Union," approved 29th of January, 1861, and accepted by the Kansas Legislature 20th of January, 1862.

The fact as to this land being part of section thirty-six, is admitted, and the State claims that it "has never been sold or otherwise disposed of."

The defendant claims title under Section 34 of the act to organize the Territories of Kansas and Nebraska, approved 30th May, 1854, the acts of the Legislative Assembly of Kansas Territory, made in pursuance thereof, and the patent of the Governor of said Territory, issued under said last named acts.

The Legislative Assembly of the Territory, at its first session, in the summer of 1855, passed two acts for the purpose of partially carrying into effect the provisions of Section 34, the one entitled, "An Act to provide for the establishment of Common Schools," and the other entitled, "An Act to grant pre-emptions to school lands in certain cases."

By the act to establish common schools, among other provisions, is one which declares these lands, their proceeds, interest thereon, and rents and profits thereof, a part of the school fund.

The act to grant pre-emptions to school lands in certain cases, provides for the pre-emption of town sites and agricultural settlements, made on school lands, in cases in which such town sites were located, and such settlements made, prior to the United States surveys of such lands.

36

Town sites to be entered at two dollars and fifty cents, and farm lands at one dollar and twenty-five cents per acre. Title to vest on payment of the money, and patents to be issued by the Governor.

I.   Section 34 of the act organizing the Territory of Kansas, dedicated sections sixteen and thirty-six in each township, to the use of schools in the Territory, and thereby passed the title to these lands out of the United States and vested them in the Territory.   See ordinance of 1787, Stat's U. S., 2 vol., 173; 3 vol., 399, 608, 472, 428, 545; 5 vol., 51, 59, 789; 9 vol., 58; 4 vol., 180, 435; 2 vol., 234, 679; 5 vol., 63; 9 vol., 330; 12 Wheat., 590; 6 Peters, 440; 2 Wheat., 198; 2 Peters, 578; 10 Peters, 713; 9 Cranch, 329; 6 Peters, 431; 10 Howard, 445; 14 Howard, 274, &c.

As yet no legal construction has been given to this act. A construction was, however, given to it by the Hon. Jacob Thompson, a former Secretary of the Interior.

One Reno applied at the land office at Kickapoo, in Kansas, to pre-empt the S. W. $\frac{1}{4}$ of sec. 36, township 3, range 22, under the provisions of the above recited joint resolution of 3d March, 1857. His application was resisted by one Tracey, who claimed to have pre-empted the land under the above mentioned act of the Kansas Legislature, and who produced a patent therefor from acting Governor Stanton.

The case was referred by the land officers to the commissioner of the general land office, who sustained Reno's application.   On appeal to Secretary Thompson, he refused to consult the Attorney General, and summarily confirmed the decision of the commissioner.

As the Secretary adopts the views of his subordinates, I give the reasons of them all, as they all are to the same effect.

The commissioner says: "By the act of 30th May, 1854, organizing the Territorial Governments of Kansas

and Nebraska, sections sixteen and thirty-six were placed in a state of reservation merely for the purpose of being applied to schools, and the Government not being divested of its title until after a grant is made, which, in other cases, was done when the Territory became a State, the sale of the school sections was illegal and of no effect. The fact of Tracey's having bought a portion of the school section, and holding a patent therefor from the Legislature of the Territory, will not be a bar to Reno's entering the same, upon complying with the law; for the reason that the joint resolution of 3d of March, 1857, makes provision for those persons who have settled upon sections sixteen and thirty-six before the survey, and thereby clearly shows that the right of those sections remained in the Government, and that at any moment Congress might release those sections from reservation, and make other provisions for schools."

. The Secretary, says:

" Sections sixteen and thirty-six are not granted, dedicated or disposed of, but are *simply reserved* by Congress, for the purpose of being applied to schools. No trust was created by said Act, unless Congress itself assumed it. That Congress did not intend to divest itself of all control over these lands is evident from the very terms employed. But if any doubt on this point could exist, it is removed by the joint resolution, approved March 3d, 1857, which provides that when any settlement, &c., shall be made upon Sections sixteen and thirty-six, before the survey thereof, other sections shall be selected in lieu thereof. The resolution is tantamount to a legislative declaration of the meaning, and will govern the construction of the former law."

No joint resolution will be deemed evidence of its own validity in a Court competent to pass upon it, however much weight it may have with a mere ministerial officer. The assumption of fact which is made the basis of the

opinion of these land officers is, that the government is not divested of title until a grant is made, which in other cases was done when the Territory became a State.

The only weight given to this assertion is by Chief Justice TANEY, having made a like assertion in his dissenting opinion in the case before referred to of the "Trustees of Vincennes University v. the State of Indiana." Judge TANEY says: "With all the researches I have been able to make I have not found a *single instance* in which lands reserved in a Territory for the purposes of education were not afterwards granted to the State as a trustee to administer the trust, the school sections in the several townships as well as others."

He relies on this fact "as confirming him in his opinion." And it seems to be the very corner stone of the opposition to the rights of the Territory in the case.

It will be found that the dedication of a portion of the public lands to the use of schools, originated even under the confederation, and has been continued to the present day, as a cherished object of legislation.

By an Act of the Confederate Congress of 1785, Statute at large, Vol. 1, 565, "Section sixteen in each township was reserved for the use of schools in such township."

The Act of 1804, which became the basis of subsequent legislation as to school lands, provided that section sixteen in each township should be reserved for the use of the inhabitants of such township for the use of schools."

Judge TANEY says that "with all his research, he has been unable to find a *single instance* in which lands reserved in a Territory for the purpose of education have not been afterwards granted to the State as a trustee to administer the trust, the school sections as well as others."

This declaration was made in 1852 at the December term of the Supreme Court.

I now refer to the acts admitting States and reservations for schools made prior to that time.

Ohio was the first State admitted. Reservations had as has been seen, been made in the ordinance of 1787. By the act admitting Ohio into the Union, the so-called grant was made in the propositions submitted by Congress. There were two sets of propositions. By the first it was provided that, " Sections sixteen in each township shall be granted to the inhabitants of such township for the use of schools."

By the second, after making a reservation of additional school lands, it was provided that these lands " with those already appropriated for that purpose shall be vested in the Legislature of the State in trust aforesaid, and for no other use, &c." 2 *Stat.* 173.

In this first instance, we see no grant was made to the State.

In Indiana, the second State admitted into the Union, the so-called grant was in these words. (3 *Stat.*, 399 :) " Section sixteen in each township shall be granted to the inhabitants of such township for the use of schools."

Here again is no grant to the State.

In Alabama the grant was, as in Indiana, " to the inhabitants of the township," and not to the State. 3 *Stat.*, 108.

In Louisiana and Mississippi no grant was made to any person, but the reservations stood on a previous reservation in the act providing for the surveys of the land. 3 *Stat.*, 472.

In Illinois, Missouri and Arkansas, the grant on admission was, " to said State, for the use of the inhabitants of the township, for the use of schools." 3 *Stat.*, 428-545; 5 *Stat.*, 51.

In Michigan, Iowa and Wisconsin, the grant was, " to the State for the use of schools." 5 *Stat.*, 59, 789; 9 *Stat.*, 58:

Of the eleven States then admitted, there were five in which no grant was made to the State. Three in which, though nominally made to the State, it was expressed to

be for the "use of the inhabitants of the township," three in which the grant was properly made to the States.

But not only do we find that no such uniformity in the action of Congress is to be found in its legislation touching these school lands as is claimed; not only do we find many instances in which no grant was made to the State, even of those lands dedicated to common schools, but it will be found that with reference to other lands dedicated to purposes of education, the assumption is even less warranted.

The error is the more remarkable in this, that in the case of a reservation made in Michigan, in almost the identical language of the Indiana Reservation, then under consideration, Congress had already recognized the very principle then decided by the Court, had recognized the validity of a reservation, to a Territory.

By the Act of May 20th, 1826, (4 *Stat.*, 180,) it is provided in an act for the survey of lands:

"The Secretary of the Treasury shall be, and is hereby authorized to set apart and reserve for sale out of any of the public lands within the Territory of Michigan, &c., not exceeding two entire townships for the use and support of a University within the Territory aforesaid, and for no other use or purpose whatever."

It will be seen this is not like ours, a formal reservation, specific in its terms, but is a most indefinite authority to the Secretary of the Treasury, merely to "set apart and reserve from sale certain lands."

Yet the Territorial Legislature on the well-settled rules of law referred to by the Supreme Court, held that even this informal dedication vested the title in the Territory and proceeded to establish a University and apply these lands to its use. A portion of them were sold by the University, and afterwards in the act admitting Michigan, although Congress proposed to vest these lands in the State as trustee, yet its proposition provides expressly that

" nothing herein contained shall be so construed as to *impair* or affect in any way, the rights of any persons claiming any of said sections under any contract or grant from the University."

This is not only an instance in which Congress did not grant these lands to the State, but it expressly recognizes the right of the Territory to dispose of them under the former informal reservation.

This was a legislative authority, in itself sufficient to sustain the decision in the case of Vincennes University.

So, too, by Act 2d March 1857, 4 Stat., 432, a reservation in the precise terms of the Michigan reservation, was made for a University in the Territory of Arkansas. Afterwards, by Act of March 2d, 1833, (4 *Stat.*, 661,) the Governor of the Territory was authorized to sell a portion of these lands, and to apply the proceeds to the erection of buildings for the University, &c., at such places as may be designated, and under such terms and conditions as may be prescribed by the Legislature of the Territory."

So, too, by Act of May 24, 1833, (2 *Stat.*, 234,) for survey and sale of lands in Mississippi Territory, lands were reserved for Jefferson College by name.

This reservation was afterwards, in 1832, —— (2 *Stat.*, 679,) recognized as vesting title in the college.

So, too, in Florida, by Act of March 3, 1823, to provide for survey and sale of lands in the Territory, the reservation was simply by providing that the public lands should be sold " with the same reservations as have been or may be provided for the sale of the public lands of the United States. A reservation for a Seminary was there made in these words :

" An entire township in each of the districts, (East and West Florida,) shall be reserved from sale for the benefit of a Seminary of learning, to be located by the Secretary of the Treasury."

These informal reservations were afterwards recognized by Congress as grants.

By Act Jan. 29, 1827, the Governor and Council are authorized to take possession of the land *granted* for the use of schools, and for a Seminary of learning, &c.; and by Act July 1, 1836, (5 *Stat.*, 63,) the Governor and Council are authorized to sell not exceeding half of two townships heretofore reserved and appropriated by Congress, for the establishment of a Seminary of learning, &c.

The University to which the lands are to be applied is designated, and is one which had been established by the Territory.

This is not only another instance which has been overlooked by Judge Taney in which the land was not granted to the State, but it is an express recognition by Congress of the legal identity in its construction of the terms "grant," "reservation" and "appropriation," in its disposition of the public lands. The words are used in this as in other cases, as synonymous, and no such distinction is made between "reservations" and "grants" as is made by Secretary Thompson.

But a further reference to the legislation of Congress will show more clearly that the purpose of Congress in these reservations has, at several periods, undergone a marked change, and has always been so clearly expressed that there was no need of inference, but it was sufficient to refer to the language itself of each reservation, to learn the intentions of Congress.

It has been seen that in 1785, the reservations of these lands were declared to be "for the use of the inhabitants of such township for the use of schools."

The schools were *local* not *Territorial* or *State*, and there was no need for the appointment of the State as trustee.

By the Act of March 26, 1804, for survey of lands in Indiana Territory, which included all North-west of Ohio River, after the admission of the State of Ohio by the Act of March 2d, 1803, for survey and sale of lands South of Tennessee; and by Act of March 3d, 1811, in reference

to lands in Louisiana Territory, the reservation was made in the same terms, "for the use of the inhabitants of such township for the use of schools therein." In the acts admitting the several States organized within the limits of that Territory, the propositions submitted to the people either were silent on this subject, granted the lands in express terms to the inhabitants of such township, or to the State for the use of the inhabitants of such township, for the use of schools therein, until the admission of Michigan into the Union in 1857.

At that time a change was made, and among the propositions then submitted to the people, was one providing that these lands should be "granted to the State for the use of schools."

As in the subsequent acts admitting Iowa and Wisconsin, the proposition was in like terms, granting these lands "to the State for the use of schools," we may infer that Congress then intended to change the character of the grant and to convert what had been a local and township fund into a common or State fund. In none of these acts from the beginning is there as yet found any reservation for the use of territorial schools.

Up to this time, too, no reservation had been made in any act organizing a Territory, but as at the beginning, all were made in acts providing for the survey of the land.

In the act organizing the Territory of Oregon, approved August 14, 1848, (9 *Stat.*, 330, *Sec.* 20,) we find for the first time, not only a reservation made, but a reservation of double the quantity of land previously reserved, and made in express terms for the use of territorial schools.

This was a marked change, and indicated a well-considered purpose.

That this was intended to be a rule of general application, is shown by its subsequent adoption in the organization of the Territories of Minnesota in 1848, Utah in 1850, and Kansas and Nebraska in 1854. In each case the res-

37

ervation is in the same terms, and in the identical language used in the Kansas act.

Since then, in the organization of the mountain and mining Territories of Colorado, Nevada, and Dakotah, still another change has been made. In these the reservations are expressly declared to be for the use of schools in the States thereinafter erected.

We find in this reference to the legislation in relation to school lands,

1st. Conclusive evidence that from 1775, Congress has regarded these reservations, however informally made, whether made for local schools to the inhabitants of townships, or to Territories or States for common schools, as being the most sacred of trusts binding upon Congress, and entitled to its most watchful protection. In no instance can there be found evidence that Congress ever pretended to claim, as is now claimed for it, the right at any time, in the untechnical language of the Secretary, "to release these lands from reservation" and deprive the schools of the benefit.

If Congress has not "granted, dedicated or disposed of these lands for the use of schools," no obligation has been incurred by it.

Congress recognizes fully all the obligations which could bind an honest man. Nor would any such claim set up for the Government be allowed by the Courts. On the contrary, the Government is held to the same strict rules of honesty as an individual; it cannot indeed take advantage of these mere informalities which would release an individual, but is as has been seen, held to its fairly inferred obligations, however informally assumed. Congress has fully recognized these obligations, and has never, save when some higher equity seemed to be presented, attempted to appropriate these reservations to any other purpose, and even then it has uniformly endeavored to make compensation by granting other lands as contiguous as may

be. Such are the cases contemplated in the resolution of March 1857, where parties in good faith, ignorantly have by the delay of the Government in making its surveys, been led to settle upon these lands and perhaps expend their all in their improvement. In such cases, Congress seems to regard the claim of the individual as the higher of the two, and by providing other lands for the schools seeks to do justice to each. Such an act is not as claimed here, an assertion of an unlimited right of Congress to dispose of these lands, but on the contrary, is a recognition of its obligation to make ·good the grant .which a seeming equity induces it to impair.

II. The investigation which has been made of the legislation of Congress on the subject of these reservations, has shown that a material change was made in their terms and in the amount of the reservation. The circumstances attending that change it is believed will not a little aid in giving a proper construction to the section under consideration.

It has been seen that.from the foundation of the Government up to the organization of the Territory of Oregon in 1848, these reservations were uniformly made in· acts providing for the survey and sale of the public lands and not in acts organizing territories and governments. A point on which Judge Taney relies for his dissent in the Vincennes case, is based on the fact that in that case the reservation was not made in the act organizing the Territory of Indiana, but in an act for the survey of the lands in that Territory which had no connection with the territorial government.

At the time of the organization of the Territory of Oregon however, we find the reservation made in the act organizing the Territory, and not in a distinct act for the survey of the lands.

We find also in the same act that the amount of land reserved is doubled—and then too for the first time we

find the purpose of the reservation changed; then for the first time the reservation is made "to be applied to the use of schools in said Territory."

It will be observed too that about that time another even more important change was inaugurated in the legislation in regard to the Territories. Up to that time the peculiar condition of territorial governments had attracted but little attention. The Territories had been regarded as a sort of political infant; they were deemed but wards of the government; they had no political rights; could only exercise such limited powers as their guardian, the federal government, deemed prudent, and even then subject to the ratification of their guardian. The Territories could not be said to possess political powers.

It is thus easy to see not only why the reservations were not made for territorial schools, but also why the Territories so seldom claimed the right to control any reservations for either township schools or colleges.

Were it then true that in the Kansas bill is to be found the first reservation for territorial schools, I could show in the peculiar circumstances attending the passage of that bill, a most conclusive reason in favor of our construction of its provisions.

The truth is our defence. As I have said, it is known as a matter of history that at and about the time this change in these reservations was made, a much more important change was inaugurated in the political condition of the Territories. That change was matured into a fixed principle in the Kansas-Nebraska bill. That principle declared the people of the Territories fit for self-government —competent to manage their own domestic affairs. Whatever may have been the difference of opinion as to the right of a Territory over the question of slavery, no one of any party denies its fitness for and right to establish schools and control school funds. That Kansas was vested with such power, no one will question.

When then it is seen that at the moment when these reservations are converted into funds for territorial schools, full power is given to the Territory to control and dispose of such funds and exclusive power given to establish such schools, it is conclusive that Congress had a purpose in such change.

That purpose was, to empower the Territory to establish schools, and to dedicate a fund to aid in their support.

Congress did not, as is now claimed, intend to use deceptive language, to make an idle or fraudulent promise. Nor was it ignorant of the legal effect of the terms used in the reservation,—terms which had clearly been construed and made technical by the Supreme Court. This will explain the fact, that when afterwards the acts of that Legislature were so carefully scrutinized by Congress, no word of objection was uttered against this law. Why, too, when two years afterwards, in the passage of the joint resolution of 1857, which is claimed impliedly to repeal the reservation, the act of the Kansas Legislature was not expressly repealed.

Having now disposed of the historical facts on which the opposition to our title rests for its basis, and shown that it was without the least foundation,—indeed, the history of our school land legislation affords a powerful argument in favor of our title—I propose to examine the legal propositions embraced in the decisions of the land officers, as upon them alone even the Attorney General is compelled to rely to defeat our title.

The Secretary, adopting the language of the commissioner, says, " These lands were placed in a state of reservation, merely for the purpose of being applied to schools;" and, reiterating, with a view to make the position more specific, the Secretary says:

" Sections sixteen and thirty-six are not granted, dedicated or disposed of, but are simply reserved by Congress for the purpose of being applied to schools."

Neither the Secretary nor commissioner undertake to define what they mean by a "*reservation of land for the use of schools.*" We are told, however, by the Secretary, that it is neither a grant, dedication or disposition of lands for the support of schools.

We are, indeed, led to infer that the provision in Section 34 of the Kansas Act, by which sections sixteen and thirty-six are reserved to be applied to schools in said Territory, and the States and Territories hereafter to be erected out of the same, is not only neither a grant, dedication or disposition of the lands for that purpose, but is not even such a promise, on the part of the Government, as would in equity bind an individual; that Congress could at any moment release these lands from reservation, and make other provisions for schools.

There are propositions involving principles of morality and justice which cannot be argued; they have only to be stated. Such is a proposition, that when the Government has, in the most solemn form, pledged a fund to the most sacred of all uses—that of education; has thus induced the people to buy its lands and settle its wilderness, it can at pleasure repudiate its pledge and resume its grant.

The absurdity of these legal propositions is such, too, that a lawyer must experience difficulty in gravely considering them. To assert that by the Kansas-Nebraska Act, sections sixteen and thirty-six were placed in a state of reservation simply for the purpose of being applied to schools; and that such reservation was "neither a grant, dedication nor disposition of these lands for the use of schools," is to assert a simple legal contradiction.

It might be supposed that the expression of these officers did not clearly convey their idea; that they did not mean to assert, without qualification, that "a reservation of land for the use of schools," was neither a grant, dedication or disposition of land; but intended only to assert that this particular reservation, for some cause peculiar to itself, and

which distinguishes it from other reservations, was not a grant, dedication or disposition of the land.

No such supposition, however, is well founded. The whole argument is based on an entire misapprehension of the legal effect of a reservation of land for public use.

It is not pretended that in the reservation of school lands made by Section 34 of the Organic Act, there is any special limitation or restriction to qualify the usual legal effect of a reservation. On the contrary, the reservation is more than usually specific, infinitely more precise than that on which the title to the Vincennes University was sustained.

I need not cite authority to show that a reservation or dedication of lands for the use of schools of a State, Territory, county, town or township, is a dedication of land to the public use.

It will not be necessary, in advance, to show that the principles which govern *dedications of land to the public use*, apply to the dedication of land to the use of schools in a Territory. It will, however, be seen in the decisions of the Supreme Court of the United States, to which I shall refer, not only that a dedication to the use of schools is a dedication to public use, but is of all such dedications most cherished by the Courts.

Reservation is appropriation; schools, a public use. In Chotard v. Pope, in speaking of reservations of land, the Court says:

"From the earliest date of the legislation of Congress on this subject, there have been *appropriations to public use*, made by withdrawing from the mass certain portions of territory for public seminaries, towns, salt springs and other objects." 12 *Wheat.*, 590.

I refer to this case to show a recognition of two plain principles.

One, that a reservation is an appropriation of lands, and the other that seminaries and schools are considered pub-

lic uses. I will not, as I might, also rely on this as an authority to show the light in which the Supreme Court regards the form of making such "appropriations;" a mere withdrawal of land from the mass of public land being sufficient, in the opinion of the Court, to create an appropriation of the land to public use. No form is necessary.

In the case of the city of Cincinnati v. White's Lessee, the Supreme Court, on the question of the form and manner of making such dedications, says:

"*There is no particular form or ceremony necessary in dedicating land to public use.* It only requires the assent of the owner of the land, and the fact that it was used for the public purpose intended by the appropriation." 6 *Peters*, 240.

The act of the Kansas Legislature providing for the sale of these lands, was passed in the summer of 1855. A copy of this, with the other acts of the same session, was not only laid before Congress, but was reprinted by order of Congress in 1860. Not only was the act providing for the pre-emption of these lands thus under the immediate consideration of Congress, but the act providing for the establishment of a system of common schools, by which the proceeds arising from the sale of these lands was appropriated, was included in the same volume, and was also then brought to its attention. There was the assent of the owner of the land, and it was used for the public purpose intended by the appropriation. There is even more than an implied assent. It is a fact judicially known to the Court, that the acts passed at that same session of the Legislature, attracted the special attention of Congress, and that a portion of them were expressly repealed by Congress. But no word of objection was uttered against either of the above named acts. Congress expressly assented to these sales, and on the principle of the above quoted decision, were there no reservation, the assent of

Congress, the sale of the land and its application to schools would sustain the title of purchasers. Such assent on the part of an individual, would bind him, and the rules of honesty and justice are equally binding on the Government.

In Rutherford v. Greene's heirs, Chief Justice TANEY, said :

"It has been said, that to make this an operative gift, the words, "are hereby," should have been inserted so as to read, "shall be allotted and are hereby given," &c. Were it even true that these words would make the gift more explicit, which is not admitted, it surely cannot be necessary now to say, that the validity of a Legislative Act depends in no degree on its containing technical terms usual in conveyance, &c.

This was a private grant, too, to which much more strict rules apply than to dedications. 2 *Wheat.*, 198.

The words "For the Lutheran Church," endorsed on a town-plat, were held to be a reservation or appropriation of the ground thus marked to public use, and to have passed the title immediately out of the party filing the plat; although there was at the time of filing, no Lutheran Church in the town. And although no such church was ever organized in the town, yet on a suit brought by the heir of the grantor to recover the land many years after the plat was filed, during which time no Lutheran Church had been formed, the Supreme Court held that the title passed out of the grantor by this informal declaration of his intention, and remained in abeyance or perhaps in the public, until a Lutheran Church might be organized. 2 *Peters*, 578.

This case not only decides that no form is necessary, but that no grantee is necessary. In that case the title passed, and it was held to be as effective as any formal deed.

In the case of New Orleans v. the United States, the facts present a case in which there was no reservee capa-

38

ble of taking for half a century after the reservation, and also in which the reservation was made by the simple endorsement of the word, "Quay" on an informal plat of the city. Yet in that case the title was held to have vested in the city, when it became capable of taking the grant. 10 *Peters*, 713.

These cases will sufficiently show the well-settled general principles, that no grant nor patent, nor any formal words of conveyance are necessary to make a dedication of land to public use; that the most informal expression, a simple word even, if it suffice to indicate the intention of the grantor, is as sufficient as the most formal and technical conveyance.

The word "reserve" is as effective as the word "grant," if it equally vindicate the purpose to be, to devote the land to the public use. Indeed, it has become of more general use in such dedications, than the word grant, and has even in a case of a grant to an individual by treaty, been held to vest as perfect a title, as the most formal patent.

There is not as in Rutherford *v.* Greene's heirs, room to claim that it is, as it seems to be regarded by the Secretary, a mere promise to make a dedication in future; the dedication is made then, at the passage of the act, by words precise and clear, in the present tense, and for a purpose present, not future. These sections, it is provided, not only "shall be," but are "hereby reserved;" not only for the use of schools at some future time of some future State, as seems to be the opinion of the Secretary, but in "said Territory"—the Territory then brought into existence. That this amounts to a dedication of these lands to a public use, and that the dedication was a present, and not a future dedication, cannot be questioned. The only pretence for a doubt, is in the omission to designate the trustee.

The Secretary says indeed, that "no trust was created unless Congress itself assumed it."

This is certainly a very loose definition of the principles by which a case of so much importance was to be decided.

If it be held as an admission, that a trust was created, even though it should be held to be in Congress, it would serve to defeat the title of the State.

But looking to the case then under consideration, and the conclusion of the Secretary in that case, it is clear that the Secretary meant to assert that no trust was created by Section 34 of the Organic Act; and it is equally evident that the Secretary is led to this conclusion by, among other reasons, the fact that no trustee was distinguished.

The cases above cited, of New Orleans v. the United States, 10 Peters, 712, of the Lutheran Church case, 2 Peters, 578, turned more especielly on the question as to whether any grant was necessary. The same question has been, in other cases, fully considered by the Supreme Court, and is now no longer an open question. *Pawlett v. Clarke*, 9 *Cranch*, 329.

In the case above cited, of the city of New Orleans v. the United States, on this question, the Court says, it is not essential that the right of use should be vested in a corporate body; it may exist in the public, and have no other limitation than the wants of the community at large.

In the case of the city of Cincinnati v. the Lessee of White, above cited, in which all these questions are considered, the Court, on pages 435–6, says :

" Objections to dedications of land to public use apply the rules which prevail in private grants."

But this is not the light in which this Court has considered such dedications. The law applies to them rules adapted to the nature and circumstances of the case, and to carry into execution the object and intention of the grantor, and to secure to the public the benefit held out and expected to be enjoyed by the dedication.

It is admitted that dedications for charitable and religious use (the grant to Kansas is for a charitable use,)

are valid without any grantee to whom the fee could be conveyed. Although such are the cases which most frequently occur, it is not perceived how any well-grounded distinction can be made between such and the present. The same necessity exists in the one case as in the other, for the purpose of effecting the object intended.

The principle, if well founded in law, must have a general application to all appropriations and dedications for public use, where there is no grantee *in esse* to take the fee.

This forms an exception to the rule applicable to private grants, and grows out of the necessity of the case. In this class of cases there may be instances contrary to the general rule, where the fee may remain in abeyance until there is a grantee capable of taking, when the object and purpose of the appropriation look to a future grantee, in whom the fee is to vest. But the validity of the dedication does not depend upon this. It will preclude the party making the dedication from re-asserting any right over the land, at all events, as long as it remains in public use, although there may never arise any grantee capable of taking the fee.

The Court says again:

"All public dedications must be considered with reference to the use for which they are made."

After being thus dedicated, and private and individual rights acquired with reference to it, the law considers it in the nature of an estoppel, which prevents the original owner from recovering it. It is a violation of good faith to the public, and to those who have acquired private property with a view to the enjoyment of the use thus publicly granted. *The City of Cincinnati* v. *White's Lessee*, 6 *Peters*, 431.

What was the object and intention of the grantor? It is that these lands shall not only be reserved, but be "applied to the use of schools in the Territory," &c.

The benefit held out and expected to be derived from and enjoyed by the dedication, was "the establishment of schools in the Territory, by the application of these lands to that purpose." This is the first and leading benefit, as it is declared to be the first and leading object of the reservation. A secondary, more remote, and a contingent benefit and object, is the establishment of schools by the application of these lands to such purpose, "in the States and Territories hereafter to be erected therein."

"To carry into effect the objects and intentions of the grantor," the Court says, "the law applies rules adapted to the nature and circumstances of the case."

The rules adapted to the nature and circumstances of this case, to carry into effect the object and intention of the grantor, must be such rules as will "apply these lands to the support of schools in the Territory;" not such as will divert the fund from that purpose.

To authorize the sale of these lands as provided by the joint resolution of 1857, is to defeat every "object and intention of the reservation."

So, too, to hold these lands at the will of Congress until a State may be formed, is equally to defeat the object and intention of the reservation in its first and leading feature, "the application of these lands to the support of schools in the Territory."

Such action would not only defeat the object and intention of the reservation, but would equally deprive the public of the benefit held out and expected to be derived from and enjoyed by the same. It would be a fraud upon those who emigrated to Kansas upon the faith of the pledge that these lands should be applied to the use of schools in the Territory.

The only rule adapted to the nature and circumstances of the case, to meet the requisitions of the Court, must be a rule which would speedily and effectually apply these lands to the support of schools in the Territory, and secure

them to be applied to schools in the "States and Territories to be hereafter erected out of the same."

The only means of attaining this end is to vest the control of these lands in that body best qualified and most interested in such application.

Thus in a dedication of land for a " quay," the title was vested in the city ; in other cases in the county, township, State or Territory, and in others, in the school or college.

In this case, under this rule, the title and control of these lands must vest in the Territory, as that alone, in the nature and circumstances of the case, is fit and competent to carry into execution the intention and object of the grant.

The Territory, by the very act which makes the dedication, is not only vested with full, but with exclusive power to establish schools in the Territory, and to apply the funds pertaining to such schools.

Whatever other " institutions " the heat of party politics may have led any to claim as subject to the control of Congress, I am not aware that any one has yet claimed for Congress the right to establish or in any way interfere with the schools of Kansas, or to interfere in the application of its school funds. On the contrary, the history of the Kansas bill, and the subsequent action of Congress, leave no room for doubt as to the political organization which was expected and intended to establish schools in the Territory and apply the school funds to the support of those schools.

" In the nature and circumstances of the case," no other than the government of Kansas could have been deemed fit or competent to " carry into execution the intention and object of the grant."

Had Congress intended to claim the right to " apply these lands to the use of schools in the Territory," it would without doubt have made provision for such application, in the act making this reservation. It was not, as are too many

other acts, passed *sub silentio,* but all the mightiest minds in the land gave to it their closest attention. It was regarded in all its features as a legislative adjudication of a great political principle. It must have been looked to by Congress as the power which would apply these lands to the use of schools in the Territory, and is the only party which by the rule of the Supreme Court could be held either fit or competent for such purpose.

There are other principles laid down in the case above cited, not less important to sustain us in this case.

The Court says:

"It is admitted that dedications for charitable and religious use are valid without any grantee to whom the fee could be conveyed."

I need not cite authority to show that a dedication of land for the use of schools, is a charitable use. In such cases, the Court says, "it is admitted that such a dedication may be made, even where there is no grantee *in being* who could take the fee."

Such would have been the case, had the reservation been made before the Territory was organized. Even in such case, the Court says: "But the validity of the dedication does not depend upon this. It will preclude the party making the dedication from re-asserting any right over the land, at all events so long as it remains in public use, although there may never arise any grantee capable of taking the fee." So that even in cases in which such reservations are made, although there be at the time no grantee capable of taking the fee, capable of carrying into execution the object and intention of the grantor, capable of executing the trust, yet if the reservation be such as may be used by the public, and be so used, the grantor cannot re-assert his rights, although a grantee never arise.

In this case there was not only a grantee capable of taking the fee, the territorial government, but the grant was in fact used by the public, by being sold, and the pro-

ceeds applied to the use of schools under the terms of the grant.

But the Court, on this subject, says further:

"All public dedications must be considered with reference to the use for which they are made. After being thus dedicated, and private and individual rights acquired with reference to it, the law considers *it in* the nature of an estoppel which precludes the original owner from revoking it. It is a violation of faith to the public, and to those who have acquired private property with a view to the enjoyment of the use thus publicly granted."

So, in this case, where by the act establishing the territorial government, inducements are held out to individuals to buy the lands of the government and settle and enhance the value of its property, by a pledge of a donation of a portion of those lands to the support of schools in the Territory, any act by which Congress might attempt to divert those lands from such purpose, would be a fraud upon all who had purchased property or settled in the Territory.

I have said that "reserve" is the word most commonly used in laws and treaties, to indicate a disposition of land. The Supreme Court has furnished us on this point, also, a decision which is conclusive, not only as to the legal effect of the word "reserve," in dedications of land to public use, but even in a conveyance of land to an individual.

Grants may be made by law, treaty or patent, and are as valid when made in one form as in another. In patents, it is usual to adopt technical terms, but in laws and treaties, it is seldom such terms are employed.

In the case of the United States v. Brooks *et al.* (10 *Howard*, 445), the question before the Court was, as to the effect of this identical word, in a treaty, by which it was claimed that a large tract of land had been granted to certain individuals.

The words used are, "Shall *have their right to the four leagues of land* RESERVED for them," &c.

The Caddoes had, in their treaty, ceded all their lands to the United States, and this reservation is made out of the lands thus ceded.

On appeal to the Supreme Court, that Court applying the well-settled rules applicable to legislative grants, disregarding all form, not requiring any technical expressions, giving to words of a future a present meaning, and looking only to the intent of the grantor, says:

" We think the *treaty* (not the *pretended donation*) gave to the Grappes a *fee simple title* to all the rights which the Caddoes had (not which the Grappes had acquired under the previous gift) to these lands, as fully as any patent from the government could make one."

" The reservation to the Grappes, their heirs and assigns, creates as absolute a fee as any subsequent act on the part of the United States could make." "Nothing further was contemplated by the treaty to perfect the title." . *United States* v. *Brooks et al.*, 10 *Howard*, 445.

Of the propositions submitted to the State of Kansas, by which it is claimed these lands are granted to the State, the second provides " That seventy-two sections shall be set apart and reserved for the use and support of a State University, to be selected by the Governor, subject to the approval of the commissioner of the general land office, to be appropriated and applied in such manner as the Legislature of the State may prescribe," &c.

The joint proposition provides :

" That all salt springs, &c., shall be granted to the State for its use, to be selected by the Governor, to be used or disposed of on such terms &c., as the Legislature may direct.

In neither case is any patent issued, nor is it necessary under the principle of the case of Rutherford *v.* Greene's heirs, even though the land is not designated in the grant but to be selected. Nor does Congress recognize the disposition no less effective in one than in the other.

If as we have seen in Brooks' case, the simple word re-serve is sufficient to vest title even to land to be selected, in an individual, how much less room is there to object to its sufficiency, in a dedication of land to public use.

On the 25th of March 1804, Congress passed an act en-titled "An Act to provide for the sale of public lands in Indiana Territory, and for other purposes," by which it was provided that said land should be divided into three land districts. These divisions corresponded substantially with what was afterwards organized into the three several States of Indiana, Illinois and Michigan. A general sys-tem of land offices and surveys was provided in the bill, and certain lands reserved from sale.

Section — then provides among other things that the land shall be sold, excepting therein previously excepted tracts, also with the exception of section numbered sixteen, which shall be reserved in each township for the support of schools within the same, with the exception also of an entire township in each of the three above described tracts of country or districts, to be located by the Secretary of the Treasury for the use of a seminary of learning.

The question before the Supreme Court arose upon the construction of the last clause of the foregoing reservation, and I will before calling the attention of the Court to the decision, direct its attention to the striking difference be-tween this reservation and the reservation of Kansas school lands.

1st. The act containing this reservation is not the act which organized the Territory of Indiana, and which might hence be regarded as properly looking to the natural and proper political action of such Territory. It is simply and exclusively in its general object, an act to provide for the survey and sale of lands within that Territory. As an incident alone to such purpose it provides for excepting from the general sale such tracts as it might be deemed in-expedient to sell without further action. It was passed

two years after the act organizing the Territory, and had no natural connection with the territorial government, while the Kansas reservation is made in the act establishing the territorial government, and is directly and necessarily connected with that purpose.

2d.   The section of the Indiana act by which this reservation is made, is not one whose object was to provide a fund for school purposes—but its chief purpose is to provide for the sales of the land in the Territory, while only as an incident thereto it provides for excepting from such sales certain classes of lands—while section thirty-four of the Kansas act has but one single purpose, the purpose of creating a fund for the establishment of schools in the Territory and the States and Territories thereafter to be organized therein.

3d.   The Indiana reservation does not specifically reserve any land for the use of the seminary; it simply *excepts from sale*, a township of land, when the same shall have been first located by the Secretary of the Treasury, while the Kansas act appropriates at the time of its passage lands which are designated by a precise and exact description.

4th.   The Indiana reservation not only fails to designate the property reserved, but is even more indefinite in its description of the use for which it is reserved.   It fails to designate the seminary of learning to which the land is to be applied, either by name, locality, or character.   We are not told whether it be intended for a seminary then in being or for one to be established.   We are not informed as to the means by which this seminary is to be established, whether by private association, by some religious order, by some town, or by the Territory.   While the Kansas reservation specifically, designates not only the property, but the schools, for whose use the dedication is to be applied.

5th.   Like the Kansas reservation, this also fails to designate the grantee or trustee for the execution of the trust by the application of the fund thus created.

The question before the Court was whether the reservation made by the Act of Congress of 1804, was a grant and whether the title was thereby vested in the trustees of the college incorporated by the territorial legislature two years after the reservation.

Judge McLean delivered the opinion of the Court:

"The title to the seminary lands, it is contended, did not vest in complainants, as they are not named in the reservation, and had no existence for two years afterwards.

"The question is not to be decided on the principles which apply to an ordinary grant, from one individual to another.   The title partakes of the nature of an executory devise, or of a dedication of property to public use.

"If the words 'reserved for the use of a seminary of learning,' were endorsed on a town plat, when made, there is no doubt that the title would vest in a corporation, created afterwards for the establishment and government of such an institution.   If it be reserved for the *public use*, the title would vest in the *public*, as soon as a *public* should exist in the town.

"There was no uncertainty in the appropriation.   The township was duly noted, and the purpose stated for which it was reserved.   And there can be no doubt from the authorities that the *right vested* as soon as a *capacity was given to the corporation to receive it*; prior to this it remained in the Federal Government.   *This is the settled doctrine on this subject.*"   *Trustees Vincennes University* v. *State of Indiana*, 14 *Howard*, 474-475:

It is said, however, that the Michigan case is evidence that Congress claimed the right to dispose of these reservations, as in the act of admission it grants to the State all that had not been sold by the Territory.

This may be admitted, and not affect our title, as the Territory had sold this land before Congress attempted to

grant it to the State, even admitting that such an attempt was made. We, however, deny that any such attempt was made, and expect to show that in this case an express exception of these lands is contemplated in the act of admission:

We stand as purchasers, whose title was recognized as undoubted by Congress, in the Michigan case, and by all parties in the Indiana case.

In every instance in which these reservations have been granted to the State, it has been by propositions submitted to the people when about to abolish their former corporate existence as a Territory, and form a new corporation as a State. *Cooper* v. *Roberts*, 18 *Howard*, 173.

There is yet further evidence of the intent of Congress to grant these lands to the Territory—evidence conclusive under the ordinary rules of law, and of more weight under the peculiar circumstances attending this case.

In other cases, when a principle has been settled by the Courts, and the Legislature has subsequently acted in accordance with that principle; when a statute has been construed by the Court, and is afterwards re-enacted by the Legislature; when, even after such construction, the Legislature has had the opportunity and has omitted to change the law,—the conclusion is uniform, that the Legislature intended to adopt the construction thus given by the Court.

As is judicially known, the Kansas-Nebraska bill attracted more attention than any act ever passed by Congress. It is said to have caused a rebellion; it certainly produced a revolution in the condition of the territories, and in the legislation of Congress in relation to them. Every word and line in it was construed and criticised by the most astute and captious politicians, by the most profound and learned lawyers. Every objection that could be urged, was brought forward to defeat it. It was passed two years after the decision of the Vincennes University

case.   The construction then given to these reservations was before the public; the trial was had, and the decision made, under the very eyes of those who framed, and those who criticised, to defeat the Kansas bill.   It would be to assume none too much to say, that it is a judicial presumption that such lawyers as Douglas, Pugh, Collamer and Fessenden, and others of the respective parties, attorneys in regular practice in the Supreme Court, its leading counsel, must have known this decision—must have understood the legal effect of this reservation.

Not only have we this evidence, but again, when in 1856, after the order of Congress, the acts of the Kansas Legislature providing for the pre-emption of these lands, when, as is known, all those acts were scanned with the most jealous eye by those who sought to render them odious, to make them appear illegal, and when, too, a portion of these laws were repealed by Congress,—we yet find that never, from any quarter, was an objection raised to the action of the Kansas Legislature providing for the pre-emption of these lands.   We have more than a mere legal presumption that Congress intended to give to this reservation the effect given by the Supreme Court, the effect claimed by the Kansas Legislature.   It can well be claimed as positive testimony.

I have not separately, as yet, considered the question, whether the trust being established, the Territory necessarily became the trustee.

In The City of Cincinnati v. White's Lessee, the Court says, the rules which prevail in private grants do not apply to these dedications, but the law applies to them rules adapted to the nature and circumstances of the case, and to carry into effect the object and intention of the grantor, and to secure to the public the benefit held out and expected to be enjoyed by the dedication.

On this broad and well-settled rule, he says of the Vincennes University case:

"If it be reserved for public use, the title would vest in the public as soon as a public should exist." And applying the rule to that case, he says: "*There can be no doubt from the authorities* that the right vested as soon as a capacity was given to the corporation to receive it."

The reservation in that case was "to a seminary of learning." The title vested so soon as the seminary was incorporated, with capacity to take the title. The property being a common, the city, as the public, took the title.

In the case of The City of New Orleans v. The United States, where the property was a "quay," the city took it as soon as incorporated, though not incorporated for fifty years after the reservation.

In the case of Beaty *et al.* v. Kurtz *et al.*, the title passed out of the grantor and was in abeyance until a southern church might be established.

Here, as in the Vincennes case, there being no room for doubt as to the use; the public to be benefitted being created by the very act creating the trust; clothed with full capacity to take the property, and alone selected and empowered to administer such trusts; to establish schools and to appropriate school funds—in the Territory of Kansas.

The trust established, there is no room for doubt, under the decisions, as to the trustee.

It has been seen, that at the time of the organization of the Territory of Kansas, a most essential revolution in the condition of the territories was effected. They were freed from the state of pupilage in which theretofore the territories had been kept. This revolution was the result not of mere abstract political theorising, but was due mainly to the historical fact then being realized, that the territories were not only settled by men fully competent to assume and to discharge all the duties of men, but were being settled by the tide of western emigration so rapidly that in fact they sprung into States almost before a territo-

rial organization could be completed. The situation of Kansas was such, that it was known and became the basis of legislation, that it would, almost in a day, be filled with a population competent to discharge all the duties of the citizens of a State. They are vested with all the powers originally pertaining to citizens of a State.

Not only was it known that an unusual influx of emigrants would pour into the Territory upon its organization, but, to the very Congress that passed this bill, it was also known, that extraordinary means would be taken to stimulate that emigration. The character of our country, so barren of timber, at once developed a, difficulty not only likely to occur, but almost inevitable. While every inducement was offered to settlers to secure pre-emptions, the reservation of two sections in each township rendered it absolutely certain that as the settlements so greatly outstripped the surveys of the public lands, many town-sites would be laid out and settlements made, in good faith, but in ignorance, upon these sections.

To remedy this evil became at once an object of the territorial Legislature, and led to the passage of the act under which defendant claims.

That this evil deserved to be remedied, is shown, too, by the fact, that two years afterwards Congress passed a like act applicable to the Territories of Kansas and Nebraska and Minnesota. That some such act should have been passed, I need not show.

Under the act thus passed by the Kansas Legislature, many who found themselves upon these lands, proceeded to pay for them and get their patents. They have expended their time and their means, seeking in good faith to secure a home for themselves and their children. The Territory received their money, and the State, as its successor, has it in her vaults. They have paid taxes on these lands to the Territory and to the State.

Many of them have purchased, like the defendant, the land by paying the Territory double the amount which it would have cost to have purchased the same from the United States, under the resolution of March, 1857; and have yet further so enhanced the value of the land, that they have paid the State already, in taxes upon the land, enough to have bought ten such sections as the State would have been enabled to secure in lieu thereof, had they, instead, entered the land under the resolution of March, 1857.

Thus far, I have discussed the question as though it were that which was presented to the Secretary of the Interior, in the case of Tracey v. Keno,—a question of conflicting titles in purchasers under the joint resolution of 1857, and the reservation in the Organic Act. I now call attention to the restricted issue in this case. There is not, nor can there ever be, any adverse claim to the land in dispute in this case, under the joint resolution of 1857. A decision in favor of the defendant will not affect any title under that resolution, nor necessarily affect the resolution itself. The State does not claim under that resolution, but her claim is rather adverse to it.

We are not, then, required to determine the validity of that resolution, and have referred to it as connecting itself with the principles involved, and also because it is relied on as evidence that the reservation in Section 34 of the Organic Act, was a mere empty promise.

There is, however, in that resolution, apart from its legal effect, evidence that Congress did not intend to repudiate the reservation made in the Organic Act, nor to repeal the act of the Kansas Legislature intended to apply the lands reserved to the use of schools in said Territory. There is one peculiarity attending this resolution which will at least enable us to infer that the act passed by the Kansas Legislature was known to the author of this resolution. It is in the fact, that this resolution, in

40

providing for cases of location of town-sites and settlements upon these lands, adopts the language of the Kansas act, and thus differs somewhat from the laws regulating town-sites and agricultural pre-emptions. It is indeed generally understood, that the Kansas act was the basis of this resolution, and that this latter was intended to secure to settlers the benefits of the Kansas act in other territories, and also in the possibility of a repeal of the Kansas act.

The fact that the Kansas act was known to Congress, and yet no intimation of a purpose was given to repeal it, is deemed good evidence that Congress did not intend to repeal it. The joint resolution did not alone relate to Kansas, but refers equally to Nebraska and Minnesota, so that no fair inference of a purpose to repeal can be drawn.

Had Congress intended to claim that this reservation was a mere idle promise, and that the land was still subject to the disposition of Congress, it is incredible that its resolution should have failed to assert this claim clearly, and it is the more incredible that no expression of a purpose to repeal the Kansas act should have been given.

Although the resolution of 1857 be invalid, as against the reservation in the 34th Section of the Organic Act, and as against the title of defendant, it is yet valid against the State, and defeats her title.

The State does not claim as successor of the Territory, but by a distinct and independent title. She claims alone by the grant made in the propositions submitted to Congress and accepted by the State after her admission. She can, then, only take such title as she could acquire at that time under the laws then in force.

The resolution of March 1857, was then in force. Before that resolution schools were prohibited from taking any lands on which towns had been laid out, or settlements made, as therein provided, but it is therein provided that other lands shall be selected in lieu thereof.

The propositions submitted to the State provide for such cases, and provide that where such lands have been sold or otherwise disposed of, the State shall select other lands in lieu thereof.

It will be seen that it is not necessary that these lands should be entered under the subsequent provisions of the law. The State is not bound to wait until it is determined whether the pre-emptors will perfect their pre-emption. The location of the town site, and the making the agricultural settlement before survey, destroys the reservation, and the State then makes her selections in lieu thereof.

The agreed facts in this case show that a town was laid off on the land in controversy as required by the resolution of March 1857, the State then by the resolution and proposition submitted, must select other land in lieu thereof. If the settlers of the town site have no title, the town site must be disposed of as other town sites where the occupants fail to get their title according to the act for the pre-emption of town sites.

But we are told the State is not in such cases as this permitted to select. The reason is given in the sixth of the propositions which provides, " that in case any of the lands herein granted to the State of Kansas have been heretofore confirmed to the Territory of Kansas for the purposes specified in this act, the amount so confirmed shall be deducted from the quantity specified in this act."

A reference to the acts of Congress will show that no other lands than those sold by the Territory, have been confirmed to the Territory—and to these reference is made.

In the acts organizing the Territories of Oregon and Minnesota, it has been seen that the reservation was made in the very terms of the Kansas Act. In the act admitting Oregon there is an exception in the very language of the Kansas proposition, of lands confirmed to the Territory, while in the act admitting Minnesota, no such exception is made.

It is understood that the reason was that in Oregon, as in Kansas, a portion of these lands had been sold by the Territory, while in Minnesota no such sales had been made. A reference to the acts of Congress will show that no other lands had been confirmed either to Oregon or Kansas.

*By the Court,* CROZIER, C. J.

The case in which the judgment sought to be reversed was rendered, was an action for the possession of specific real property. The possession of the defendant below was admitted, the title being the only matter in controversy. To maintain the action it was necessary for the plaintiff below to show title in itself. In this class of cases the plaintiff must recover, if at all, upon a paramount title; and whatever may have been the title of the defendant in possession, unless the plaintiff could show a better one, it must fail in the proceeding.

What then, was the title of the plaintiff? The Act of Congress of January 29th, 1861, admitting the State of Kansas into the Union, by a provision in the third section, granted to the State for the use of schools, sections sixteen and thirty-six in each township of public lands, except where they or either of them had been "sold or otherwise disposed of." The land in controversy in this case, being part of section thirty-six, was by that provision vested in the State, unless before the passage of the act the land had been "sold or otherwise disposed of." This phrase evidently refers to a sale, or other disposition of the lands by the United States. It was claimed by the defendant that the selection and occupancy of a town site which the agreed statement of facts shows were made before the survey of the lands, was, under the provisions of the joint resolution of March 3d, 1857, (*Stat. at Large, Vol.* 11, *page* 254,) such a disposition thereof as was contemplated by the third section of the act of admission. This claim is clearly

untenable. The agreed statement shows that the public sales of the body of lands in which the land in dispute is included were made in September 1859. The agreed statement shows also, that the defendant had acquired no title whatever from the United States in pursuance of the selection and occupancy of said lands as a town site, prior to that time. The selection and occupancy of the lands before the survey thereof, gave the occupant no rights whatever, unless that were followed by a purchase from the United States prior to the public sale of the body of lands in which they were included. There is no pretence that any attempt was made prior to September 1859, or at any other time to pre-empt or purchase the lands from the United States. It must necessarily follow that the selection and occupancy as a town site shown by the agreed statement of facts, would not have prevented the title from vesting in the State under the act of admission; and it would follow that the State might maintain this action if there were no other obstacle in the way. This brings us to the title acquired by the purchase from the Territory.

If the parties under whom the defendant claims acquired no title by the purchase from the Territory, the plaintiff ought to recover; but if that sale was legal,—if the Territory had the power to sell, then the defendant must succeed. It may have been very bad policy to sell that portion of section thirty-six, in township five, of range twenty, in which the lot in controversy is situate at the time the sale was made, for the sum of two dollars and fifty cents per acre. The history of the country shows that it was then worth much more than that price. It was a part of the site of the then second city in the Territory,—a city eligibly located geographically, and withal reasonably ambitious. Had the land been sold at public auction it would probably have brought at least four times the price fixed upon it. But these considerations can not affect the title of the purchaser if the Territory had the power to

sell. , However much posterity may regret the imprudence of the then ruling powers, they must reconcile themselves to the consequences of their legal acts.

The object of the act of May 30th, 1854, was to define the boundaries of, and establish municipal governments within the territories of Nebraska and Kansas.   All the necessary machinery for such a government was provided, —a legislature to enact laws, courts to administer them, and an executive to execute them.   In inaugurating, managing and perfecting their domestic polity, the people were omnipotent, except in so far as they were restrained by the constitution and laws of the United States.   They might lawfully provide for the protection of themselves and of their property.   They could establish county, township, and city governments.   They could regulate the alienation and acquisition of property.   In short, the power of the Legislature extended to all rightful subjects of legislation consistent with the constitution of the United States, and the provisions of the act organizing the Territory.   This grant certainly included the power to establish schools. They are rightful subjects of legislation.   The people who would inhabit the Territory would migrate, mainly, from States where schools had been established by law, and the very terms of the organizing act contemplate the establishment of "schools in the Territory."   In the argument, the power of the Legislature to establish schools was not questioned.

The power of establishing schools being conferred, and the law-giver expecting a disposition among the future inhabitants of the Territory to avail themselves of that power, it was eminently just and proper that they should be aided in their efforts in that direction to the same extent that the people of the States had been aided.   The power of Congress was ample, and had been exercised in many instances.   No good reason can be given for aiding the educational interests of the people of a State, which with

equal force will not apply to those of the people of a Territory. They are all citizens of the same nation, acknowledge the same sovereignty, and are parts of the same people. The fact that the gratuity must in one case be administered by the authorities of a State, and in the other by those of a Territory, is no good reason why the people who in both instances are the real beneficaries, should in the latter be left to their own undivided efforts.

Considering, then, the object to which these lands were to be applied, it could not be regarded as a strange proceeding on the part of Congress, that it had placed their management under the control of the territorial authorities. Did Congress do so?

The thirty-fourth section of the Organic Act is in these words:

"SEC. 34. When the lands in said Territory shall be surveyed under the direction of the government of the United States, preparatory to bringing the same into market, sections number sixteen and thirty-six in each township shall be and the same are hereby reserved for the purpose of being applied to the use of schools in said Territory, and in the States and Territories to be hereafter erected out of the same."

As has already been observed the objects of this act were, so far as the Territory of Kansas is concerned, the fixing of the boundaries thereof and establishing a government therein. It contains no provision for the sale or other disposition of the public lands therein. Another act upon that subject was passed at the same session. Section 5 of this latter act is substantially a copy of section 34 above quoted. It must be apparent that something more than a mere reservation from sale was contemplated by section 34; and upon its construction the rights of the parties must depend.

It is well settled that no particular words are necessary to constitute a grant, especially for public uses; and we

are fully satisfied from the authorities that section 34 amounted to a grant of the lands therein described, to the people of the Territory, for the use of schools,—a dedication—an appropriation thereof for that object.   *Chotard* v. *Pope*, 12  *Wheat.*, 590; *Rutherford* v. *Greene's heirs*, 2 *Wheat.*, 198; *City of Cincinnati* v. *White's Lessee*, 9 *Peters*, 240; *New Orleans* v. *the United States*, 10 *Peters*, 713; *Trustees of Vincennes University* v. *the State of Indiana*, 14 *How.*, 268.

The object of the provision was to furnish the basis of a perpetual fund for the benefit of the people who should inhabit the country constituting the Territory, and they were authorized to make the lands available for the use of schools during the existence of the territorial government.   The language is "for the purpose of being applied to the use of schools *in said Territory*."   How could they be applied to the use of schools "in said Territory" if the people were to have no control of them until a State should be erected and admitted into the Union?

Having found that section 34 amounts to a grant, that the people of the Territory were the beneficiaries and that the lands might be made available during the territorial existence, what was the proper authority to administer the trust?

A sale of these lands or at least a portion of them must have been contemplated.   In a sparsely settled country it could not have been reasonably expected that they could be leased.   Lands being abundant and cheap, persons desiring to till the soil could easily procure the fee simple in broad acres upon which to expend their labors in the way of improvements.   The only way of making the lands available was by their sale.   To accomplish this, certain rules and regulations were necessary.   The manner of the sale, the form of conveyance, the officer to execute the same, the person to receive the purchase money must be pointed out. Who so competent to do these things as the people who

The State of Kansas v. Stringfellow.

were the beneficiaries, acting through their Legislature? The fund being a common one, in the whole and each part of which, the people had a joint interest, that authority which extended over the whole people was the proper one to administer the trust. Practically there was no other authority to administer it.

The manner of making the lands available was entrusted to the discretion of the Legislature; and as there was no other manner of doing so than by their sale, that was the means adopted.

But it is objected that no title could pass under the sale ordered by the Legislature, because an illegal application of the proceeds was directed. The proceeds were, by the act of the Legislature applied to the use of schools in the township in which the lands sold might be situated, when the grant contemplated a common fund. This state of things would not defeat the title of the purchaser. He could take the legal title although not bound to see the purchase money properly applied. If the purchase money were properly applied by the trustee it might be that the lands would be subject to a. charge for the amount of the value thereof fixed by the Legislature, but the purchaser would have the title nevertheless.

We think, therefore, that the defendant at the time of the commencement of the suit in the Court below, had the legal title to the lands in controversy, and was entitled to the possession thereof.

The judgment will be affirmed.

All the justices concurring.