## E. P. BAKER v. RACHEL NEWLAND.

1. OSAGE CEDED LANDS; *Certain Sections Granted for Schools.* The joint resolution of congress of date April 10, 1869, in respect to the disposition of the lands ceded by the Osage Indians to the government, by the treaty of September 29, 1865, which provided "that the sixteenth and thirty-sixth sections in each township of said lands shall be reserved for state school purposes, in accordance with the provisions of the act of admission of the state of Kansas," operated as a grant of said sections to the state for school purposes.

2. ———— *Title of Grantee.* Such grant was not in violation of the terms of the trust upon which said lands were ceded to the government; and even if it were, the title of the grantee would not thereby fail, although the Indians might have an equitable claim upon the government for compensation on account of its breach of trust.

3. TITLE, *When not to be Questioned.* Where, after a forfeiture of school lands by non-payment of the purchase-money, the lands are regularly taxed and sold for non-payment of taxes, and the purchaser of the tax title pays the balance of the purchase-money to the proper authorities, and receives a patent from the state, *held,* that no private individual can question the title thus conveyed.

*Error from Wilson District Court.*

ACTION brought by *Baker* against *Newland,* for the possession of certain land in Wilson county.` October 9, 1879, the court found for the defendant, and gave judgment accordingly. The plaintiff brings the case here. The opinion states the facts.

*Willard Davis,* attorney general, and *A. B. Jetmore,* for The State and the plaintiff in error.

*S. S. Kirkpatrick,* for defendant in error.

The opinion of the court was delivered by

BREWER, J.: In the year 1870, John Newland (now deceased) and his wife, Rachel Newland (defendant in this action), settled upon the tract of land in controversy, to wit, the east half of the southwest quarter, and the west half of the southeast quarter of section sixteen, in township twenty-nine, south, of range seventeen, east, in Wilson county, Kansas, and proceeded to improve the same. Soon thereafter, in the same year, Newland filed in the local land office, then situated at Humboldt, Kansas, his declaratory statement under §12, act of July 15, 1870, an act of congress providing for the sale of lands formerly occupied by the Great and Little Osage Indians, to actual settlers. Newland tendered the local land office the amount of money necessary under the act of congress aforesaid, and offered to make the necessary proofs, and demanded his certificate of entry, which was by the local land office refused, for the reason that the lands sought to be purchased were included within the grant to the state of Kansas for the use of schools. On the 20th day of June, 1871, John Newland contracted with the state of Kansas to purchase the lands mentioned under the law making provi-

sion for the sale of school lands in the state of Kansas, and then made his first annual payment under said contract, and on the 20th day of June, 1872, made his second annual payment, and thereafter made no further payment under the contract. In the year 1873 the tract of land in dispute was assessed for taxation, and, being delinquent, was, on the 4th day of September, 1875, sold for the tax of 1874, and was bid in by the county treasurer for the county of Wilson. The land was also assessed for the years 1875 and 1876. In the year 1875 John Newland died, leaving his wife Rachel in possession of the premises in dispute. In the year 1876 Rachel Newland filed her declaratory statement under § 12, act of July 15, 1870, at the local land office at Independence, Kansas, and afterward tendered to the local land office the amount necessary to enter the land under the act of congress aforesaid, which office refused to accept her money, for the same reason that John Newland's money was refused at the local land office at Humboldt. On the 18th day of July, 1877, the plaintiff, E. P. Baker (a resident of the state of Iowa), paid to the treasurer of Wilson county the taxes levied on said land for the years aforesaid, with interest, penalties and costs, and took an assignment of the land in dispute, and on the same day paid to the treasurer of Wilson county the principal and interest due the state on the contract of John Newland. Upon this payment being duly certified to the proper officers, a patent was issued to plaintiff by the state, and thereupon, defendant refusing to surrender possession, this action was brought. Upon the trial, judgment was entered in favor of the defendant, and plaintiff alleges error.

The sole question presented by the record here is, the validity of the patent issued by the state to the plaintiff. This is assailed on three grounds, viz.:

1st. The land in controversy was not embraced within the grant to the state of Kansas for the use of schools.

2d. If it was so embraced within the grant, it violates the treaty between the United States and the Great and Little Osage Indians.

3d. The plaintiff's purchase was in violation of the law providing for the sale of school lands in the state of Kansas.

The land at the time of the admission of Kansas into the Union was a part of the Osage Indian lands occupied by that tribe under the treaty of June 2, 1825. (7 U. S. Stat., p. 240.) The ordinance prepared by the Wyandotte convention, which with the constitution was submitted to congress, contained this section:

"SECTION 1. Sections numbered sixteen and thirty-six, in each township in the state, including Indian reservations and trust lands, shall be granted to the state for the exclusive use of common schools; and when either of said sections, or any part thereof, has been disposed of, other lands of equal value, as nearly contiguous thereto as possible, shall be substituted therefor."

The provisions of this ordinance were not satisfactory to congress, and in the act of admission it legislated as follows:

"SEC. 3. *And be it further enacted,* That nothing in this act shall be construed as an assent by congress to all or any of the propositions or claims contained in the ordinance of said constitution of the people of Kansas, or in the resolution thereto attached; but the following propositions are hereby offered to the said people of Kansas for their free acceptance or rejection, which, if accepted, shall be obligatory on the United States, and upon the said state of Kansas, to wit:

"First, that sections numbered sixteen and thirty-six, in every township of public lands in said state, and where either of said sections or any part thereof has been sold or otherwise been disposed of, other lands, equivalent thereto and as contiguous as may be, shall be granted to said state for the use of schools." . . .

These propositions were accepted by the state, by a joint resolution of the legislature, of date January 20, 1862. (Comp. Laws 1879, p. 79.) They define and constitute the extent of the school-land grant at that date. Counsel for defendant argues very forcibly that Indian lands are not public lands, and therefore not within the terms of this grant. We shall not stop to consider this argument, but pass to further matters.

By treaty with the Osages, concluded September 29, 1865,

(14 U. S. Stat., p. 687,) their lands were ceded to the United States. The cession reads as follows:

"ARTICLE 1. The tribe of the Great and Little Osage Indians, having now more lands than are necessary for their occupation, and all payments from the government to them under former treaties having ceased, leaving them greatly impoverished, and being desirous of improving their condition by disposing of their surplus lands, do hereby grant and sell to the United States the lands contained within the following boundaries. . . . And in consideration of the grant and sale to them of the above-described lands, the United States agree to pay the sum of three hundred thousand dollars, which sum shall be placed to the credit of said tribe of Indians, in the treasury of the United States, and interest thereon at the rate of five per centum per annum shall be paid to said tribe semi-annually, in money, clothing, provisions, or such articles of utility as the secretary of the interior may from time to time direct. Said lands shall be surveyed and sold, under the direction of the secretary of the interior, on the most advantageous terms, for cash, as public lands are surveyed and sold under existing laws, including any act granting lands to the state of Kansas in aid of the construction of a railroad through said lands, but no preëmption claim or homestead settlement shall be recognized. And after reimbursing the United States the cost of said survey and sale, and the said sum of three hundred thousand dollars placed to the credit of said Indians, the remaining proceeds of sales shall be placed in the treasury of the United States, to the credit of the 'civilization fund,' to be used under the direction of the secretary of the interior, for the education and civilization of Indian tribes residing within the limits of the United States."

On the 10th of April, 1869, congress passed this joint resolution (16 U. S. Stat., p. 55):

"*Resolved by the senate and house of representatives of the United States of America in congress assembled,* That any *bona fide* settler residing upon any portion of the lands sold to the United States, by virtue of the first and second articles of the treaty concluded between the United States and the Great and Little Osage tribe of Indians, September twenty-ninth, eighteen hundred and sixty-five, and proclaimed January twenty-first, eighteen hundred and sixty-seven, who is a citizen of the United States, or shall have declared his intention to become a citizen of the United States, shall be

and hereby is entitled to purchase the same, in quantity not exceeding one hundred and sixty acres, at the price of one dollar and twenty-five cents per acre, within two years from the passage of this act, under such rules and regulations as may be prescribed by the secretary of the interior: *Provided, however*, that both the odd and even-numbered sections of said lands shall be subject to the settlement and sale as above provided: *And provided further*, That the sixteenth and thirty-sixth sections in each township of said lands shall be reserved for state school purposes, in accordance with the provisions of the act of admission of the state of Kansas: *Provided, however*, That nothing in this act shall be construed in any manner affecting any legal rights heretofore vested in any other party or parties."

That the proviso concerning the sixteenth and thirty-sixth sections is in effect a grant of such sections, is for this court settled by the decision in *The State v. Stringfellow*, 2 Kas. 263. In that case the language construed was, that "sections number sixteen and thirty-six in each township shall be and the same are hereby reserved for the purpose of being applied to the use of schools in said territory." And upon this the court, by CROZIER, C. J., remarks: "It must be apparent that something more than a mere reservation from sale was contemplated by section thirty-four; and upon its construction the rights of the parties must depend. It is well settled that no particular words are necessary to constitute a grant, especially for public uses; and we are fully satisfied from the authorities that section thirty-four amounted to a grant of the lands therein described to the people of the territory, for the use of schools — a dedication — an appropriation thereof for that object. (*Chotard v. Pope*, 12 Wheat. 590; *Rutherford v. Greene's Heirs*, 2 Wheat. 198; *City of Cincinnati v. White's Lessee*, 9 Pet. 240; *New. Orleans v. United States*, 10 Pet. 713; *Trustees of Vincennes University v. The State of Indiana*, 14 How. 268.)"

Counsel urges against this, that the proviso is limited by the latter clause, "in accordance with the provisions of the act of admission of the state of Kansas," and that as by that act none of these Osage lands were granted to the state, none

pass by the reservation in this proviso. In other words, no more passed to the state than it really had received under the act of admission. Again, that the supposed grant is further limited by the subsequent proviso, so as not to conflict with any vested legal rights; that by the treaty stipulations the Osages had a vested legal right to a sale of these lands for cash — a right which would be most seriously affected by any donation; and finally, that the government held these lands in trust for a special purpose; that no construction can be tolerated which implies a breach of this trust; and that the government could not if it would violate the treaty and the trust thereby assumed, by giving away lands it held only to sell. This argument does not commend itself to our judgment. It cannot be supposed that congress went through a form of words, meaning nothing; that it used language implying a grant but intending none. The sixteenth and thirty-sixth sections shall be reserved. The lands are named and the grant is positive and absolute. To suppose this annulled by the latter words of the proviso, is giving unwarranted force to a mere qualifying or explanatory clause. A reasonable construction is, that the sixteenth and thirty-sixth sections of these Osage lands, now belonging to government, are granted just as the same numbered sections of other government lands had been granted by the act of admission. The accord is in the numbers of the sections, and the purposes of the grant. In harmony with the spirit and intent of the act of admission, as well as the general purpose of congress in respect to schools, it extends the grant of the act to lands not at that time fully within the disposal of the government. It is a grant in accord with the grant of the act, but is an actual grant, and not a mere recognition or confirmation of a doubted or disputed title.

It is true no construction of an act of congress will be favored which implies any disregard by the government of treaty obligations, or any breach of its trust. And it is along the line of this argument that much of the opinion in the case of the *L. L. & G. Rld. Co. v. United States*, 92 U. S.

733, runs. But still, if, though in plain violation of treaty and trust, the government should convey the land without consideration, the title of the grantee would have to be sustained. A treaty is but a contract between nations, and if either breaks it the act may be a wrong to the other, and one giving equitable right to compensation; but no subject of the nation breaking the treaty can repudiate the act of his own government. He does not stand in the courts as the next friend of the other contracting nation. So that if congress had granted this entire body of lands to the railroad corporations which claimed in the case from 92 U. S., *supra*, a portion of them, or should grant them all to the state for school or other purposes, the title of the grantee would be good. No individual could dispute or defeat it on the plea that the government should have received a cash consideration.

But we need not rest this case upon the power of the government to do a wrong. The treaty must be construed in the light of existing facts and settled lines of policy, and with the view of accomplishing the substantial objects, and not in a narrow or technical sense. It transferred a large tract of land hitherto vacant and unoccupied, a mere hunting-ground of the Indian, and contemplated a survey and subdivision into farms, and that it should become the homes of white men. It referred to existing laws as to survey and sale, and provided that they should govern in respect to the disposition. The land was to be sold "on the most advantageous terms, for cash;" but this has reference to the tract as a whole, and it left to the government a discretion as to how those most advantageous terms could be secured. It would be a strange perversion to hold that the government was bound to exact cash for each separate quarter-section, when by granting a few for certain purposes a higher price could be obtained for the remainder and a larger amount realized from the tract as a whole. By established policy and existing laws, certain sections of public lands are set apart for school purposes. It seems to have been contemplated that the same policy should control in the disposal of these lands. While it may not be

in terms said that this policy or disposition should control the limitations expressed, the exclusion of homestead and preëmption claims and the reference to railroad grants all strengthen this conclusion.   But even if the treaty were entirely silent as to these matters, the general provision to sell on the most advantageous terms, for cash, would give to the trustee a discretion as to the best means of securing such terms.   The government was to exclude homestead and preëmption claims; but those excluded, it was to dispose of the land in such manner as, in its judgment, would realize the most.   The government has exercised its discretion, pronounced its judgment, and by the joint resolution, *supra,* has said what it thought the most advantageous terms — school grants, and $1.25 per acre if purchased within two years.   Shall the courts say that the government erred, and that more advantageous terms could have been obtained?   Upon what could any such assertion be based?   It would contravene the established thought of to-day, that wealth runs along the school-line, and that the school house is a grand factor in compelling and directing emigration.

We conclude that the implications of the treaty are in favor of the ordinary school grant, and that the express power authorizes such a grant.   Congress by it had violated neither the letter nor the spirit of the treaty.   The full legal title being in the government, it could dispose of it as deemed best. Its disposition no individual can question.   And its disposition was in this case within both the power and the thought of the treaty.

The other question is based upon the assumption that this was school land.   In *The State v. Emmert,* 19 Kas. 548, we held that upon non-payment there was a forfeiture; that this forfeiture did not depend upon judicial action, but arose *ipso facto* upon the failure of payment.   Now it is said that no right to tax state lands exists.   On June 20, 1873, default being made in interest, the rights of John Newland, the purchaser, ceased.   The land became and was absolutely the property of the state.   It was not subject to tax, and no tax

3 — 25 KAS.

proceedings subsequently thereto were of any validity. A purchaser at such proceedings took nothing, and could not make a purchase thereat the stepping-stone to the acquisition of the title from the state. The patent therefore was void, and passed no title. We cannot assent to these views. It is generally true that one in whose favor a forfeiture exists, may waive it. The state was the party entitled to the benefit of this forfeiture. No one else could claim its benefits. If, notwithstanding, it receives full payment of the purchase price and gives a patent, it does not lie in the power of any individual to question that title. Doubtless many instances will be found in the history of this state in which purchasers of school lands have failed to make their payments on the very day. Technically and strictly, such failure worked a forfeiture. But if notwithstanding thereafter such purchasers completed their payments and received patents, we suppose that their title is safe; certainly as against anyone but the state, and probably as against it. It may be said that no officer is in terms authorized to waive such a forfeiture, or to relinquish any legal claims of the state. No officer can act outside the law, and bind the state. Doubtless this is true. But where the just and equitable claims of the state are fully satisfied, the acts of its officers in waiving mere technical and arbitrary forfeitures, and which are never challenged by the state itself, will be upheld as against the complaints of any third party. (*Ewing v. Baldwin*, 24 Kas. 82.) The transaction was between the state and the plaintiff. It has received its price for the land, and executed its conveyance. No stranger to this transaction can question its validity.

The conclusions we have reached being in favor of the plaintiff's title, the judgment of the district court will be reversed, and the case remanded with instructions to render judgment upon the facts found in favor of the plaintiff in error, for possession and costs.

HORTON, C. J., concurring.

VALENTINE, J.: I concur in the result reached, and in

the judgment rendered in this court; but I cannot say that I fully concur in all that is said in the opinion of Mr. Justice BREWER, or in the syllabus.